Filed 12/20/21  P. v. Tyler CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C087798 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF172343) |
| v. | |
| TED WILLIE TYLER, | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed on December 1, 2021, be modified as follows:

On pages 13-14, in the paragraph beginning "On June 28, 2018, the trial court granted," both times the words "plus s for the nickel prior enhancement" in the paragraph's third sentence are to read, "plus five years for the nickel prior enhancement."

On pages 14-15, in the paragraph beginning "The trial court resentenced," the words "plus s for the nickel prior enhancement" in the paragraph's second sentence are to read, "plus five years for the nickel prior enhancement."

1

There is no change in the judgment.

BY THE COURT:

_____
HULL, Acting P. J.

_____
ROBIE, J.

_____
DUARTE, J.

Filed 12/1/21 P. v. Tyler CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C087798 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF172343) |
| v. | |
| TED WILLIE TYLER, | |
| Defendant and Appellant. | |

A jury found defendant guilty of oral copulation with a person under 14, four counts of lewd or lascivious acts upon a child under 14, and contacting or communicating with a minor with the intent to commit a sexual offense, all based on incidents involving his stepdaughter, L.T.  On appeal, defendant asserts (1) the evidence was legally insufficient to support the jury's determinations that he committed offenses against L.T., largely because she was not asked to identify him at trial; (2) the trial court abused its discretion in admitting evidence of a prior sexual offense pursuant to Evidence Code section 1108 because the incident was remote in time and inflammatory; (3)(a) the

1

prosecutor committed misconduct in closing argument because his argument that defendant lacked sexual boundaries invited the jury to convict him based on character rather than on the evidence of his guilt, (b) if he forfeited his prosecutorial misconduct contention, he was denied the effective assistance of trial counsel, and (c) the trial court erred in denying his new trial motion based on the prosecutor's closing argument; (4) cumulative trial error warrants reversal; (5) the trial court erred in adding five-year enhancement sentences on each count rather than imposing just one such sentence; and (6) the sentence imposed on count 6 was longer than authorized and execution of that sentence should have been stayed pursuant to Penal Code section 654 (statutory section references that follow are to the Penal Code unless otherwise stated).

Defendant's convictions were supported by substantial evidence. Even if it was error to admit evidence of a prior sexual offense under Evidence Code section 1108, the error did not prejudice defendant. Defendant's trial attorney was not constitutionally ineffective for failing to object to the prosecutor's closing argument and the trial court did not abuse its discretion in denying defendant's new trial motion based on the prosecutor's argument. There was no cumulative trial error. As defendant acknowledges, the trial court corrected the sentencing errors of which he complains, and, under the circumstances of this case, it had jurisdiction to do so. Finally, the trial court properly declined to stay execution of the sentence imposed on count 6 pursuant to Penal Code section 654.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

An information charged defendant with oral copulation with a person under 14 (Former § 288a, subd. (c)(1); count 1), four counts of lewd or lascivious act upon a child under 14 (§ 288, subd. (a); counts 2-5), and contacting or communicating with a minor with the intent to commit a sexual offense (§ 288.3; count 6). The information further

2

alleged defendant had previously been convicted of two or more serious felonies within the meaning of section 667, subdivision (e)(2), that he had been convicted of a prior serious felony within the meaning of section 667, subdivision (a)(1), and that he had served two prior prison terms within the meaning of section 667.5, former subdivision (b).

The Prosecution Evidence

L.T. was born in October 2003 and was 14 years old at the time of trial. L.T. had one sister and one brother. Her mother was married to defendant Ted Tyler who was not L.T.'s biological father.

L.T.'s mother met Ted Tyler when she was living in Southern California. L.T.'s mother identified defendant in court as Ted Tyler. L.T.'s mother and defendant married, having two wedding ceremonies, one in September and one in October 2015 and they moved to West Sacramento in January 2016.

L.T. and her siblings, who, for a time, had been living with their biological father, came to live with L.T.'s mother and defendant in April 2016. Thus, as of late 2016, after L.T.'s 13th birthday, L.T., her mother, defendant, and L.T.'s siblings were living together in a house in West Sacramento.

We note that, as will be addressed in part I of the Discussion, *post*, L.T. was not asked to identify defendant in court. However, as illustrated by the following exchange, L.T. and the attorneys repeatedly referred to defendant as such, as well as by his name Ted and Mr. Tyler. Defense counsel, beginning her cross-examination of L.T., addressed allegations L.T. had made "against Mr. Tyler," whom she acknowledged she was representing.

"Q     Okay. Now, when you first met Mr. Tyler, when you first met the defendant, did he live with you guys right away?

"A     No.

3

"Q     Okay. How soon after you met him did he start living with you guys?

"A     Like a couple months after.

"Q     All right. And do you remember when your mom and the defendant got married?

"A     Yes.

"Q     When was that?

"A     In October."

L.T. testified that there were times when defendant would give her massages. L.T. would ask for massages and defendant would give her shoulder massages. Usually, when no one else was around.

At some point after defendant married L.T.'s mother, L.T. started to feel uncomfortable around him. Defendant started to look at L.T. "differently than" he looked at her siblings.

Eventually, defendant touched L.T. in a way that made her feel afraid or uncomfortable. The first time it happened, L.T. was lying on the couch watching television and he started rubbing her leg from the bottom to the mid-thigh. No one else was around.

On another occasion, defendant gave L.T. a massage during which he touched her breasts. L.T. testified that it made her feel weird and uncomfortable, and "it was, like, the first time that he actually touched me in an inappropriate way." L.T. testified: "We were in my mom's room, and no one was there. And he just started touching my breasts and kind of like I was confused, I didn't know, but I was, like, why are we doing this and stuff like that. And he kind of just said that it was like a side thing."

On another occasion, on a night sometime before Thanksgiving, L.T. and defendant were in defendant's Mercedes on their way back from the grocery store. Defendant pulled over by an apartment complex. L.T. testified: "we were sitting there, and I asked what are we doing there, and he said that you would see. And then he asked

4

me if I could put my mouth on his private part, and I said no, and he kind of grabbed me and kind of made me, but then I was like I'm not doing this. And he kind of just—we just stopped. And then he pulled me to the front seat and started pulling down my pants, and that's when that happened." L.T. clarified that by "private part," she meant his penis. When defendant pulled L.T.'s head towards him, she was scared and confused and did not know what to do. She was scared that he would hurt her or get really angry. He did put his penis in L.T.'s mouth for two or three seconds. After L.T. moved her head and said she was not going to do it, he moved her from the passenger seat to the driver's seat. He took her pants down and pulled her onto the driver's seat facing him. She did not recall whether defendant had to push his seat back so that she would fit in the seat with him. He then put his penis inside L.T.'s vagina. L.T. said that it hurt, and he told her that was because it was her first time. She estimated it lasted for one to two minutes. At some point, he stopped, L.T. went back to her seat, and she pulled her pants up. L.T. testified that, when she got home, she did not tell anyone what had happened. She was scared to tell her mother because she did not want to cause problems and break up the family.

L.T. testified defendant made her have sex with him on two other occasions. Both times happened at her house, once in the living room and once in the master bedroom.

With regard to the encounter in the living room, defendant took his clothes off, and he took L.T.'s clothes off. Defendant indicated that he wanted to have oral sex. He asked her and she said no. Defendant then put his penis in L.T.'s vagina.

Before defendant made L.T. have sex with him for the third time, he texted L.T. and told her to tell her mother that L.T. was sick so L.T. would stay home from school the next day. The following day, L.T.'s mother went to work. L.T. went downstairs to get breakfast and then went back upstairs. Defendant told L.T. to come into his room. When L.T. entered the room, defendant closed and locked the door. L.T. testified: "I sat on the bed, and that's when I realized that—like why he told me to stay home from

5

school, tell my mom that I was sick. I just remember that he kind of, like, implied that he wanted to have sex, and I didn't really say anything. I was quiet the whole time, but then that's what happened." L.T. testified that defendant took his clothes off and he took her clothes off. He then put his penis in her vagina. L.T. asked if he was going to use a condom, and he told her "he didn't need one because he didn't have anything like STDs or anything like that." The sex on this occasion lasted a couple of minutes. L.T. remembered "trying not to—I remember trying not to think about it so that I could like feel better about it, I guess, and not feel as, like, scared and stuff, so I tried not to think about it."

Again, after the encounter, L.T. did not tell anyone. She was embarrassed and scared, and she did not want to cause trouble or break up the family. Defendant told L.T. that if she told anyone what had happened, her mother would get mad.

L.T.'s mother testified that, at some point, she and defendant began to experience difficulties in their marriage, specifically "the intimacy part." She questioned why she and defendant would go out on dates and, when they came home, he "wouldn't have . . . desire for [her] at all." She thought he might be having an affair. L.T.'s mother "became very suspicious a month before it happened, before everything fell out." She "knew something was wrong in [the] marriage. [She] just didn't know what it was." L.T.'s mother also knew "there was late night texts going on one night."

Feeling like she "couldn't take it anymore," one morning, L.T.'s mother began to call numbers appearing on the phone bill. When she went to call one of the numbers, she "was able to tie that into my daughter's phone. . . . [A]nd that's how I found out." L.T.'s mother testified L.T. never told her what had been happening.

L.T.'s mother called the police. L.T.'s mother testified: "When I found out, I called 911. He was just getting out of bed, and it was what's the nature of the emergency. I started giving them the address. He had no idea what was going on. And he just knew it, and I think, finally, he knew I was calling the police, and I might have

6

said something, I just can't remember the exact words that I said to him." Defendant left the house and was not there when the police arrived. L.T. also testified that, the day the police came, defendant was not there, as he had left. When he came back to the house to retrieve his things later, defendant told L.T. that "it wasn't [her] fault and that he was sorry."

Officer Sean Saylor of the West Sacramento Police Department responded to a 911 hang up call on February 22, 2017. When he arrived, he spoke with L.T.'s mother. However, she told Saylor that she "needed to do a little bit more investigation on her own." Saylor asked if he could speak with the children, and L.T.'s mother declined. However, Saylor informed her that, based on her calling 911 and the statements made to dispatch, Saylor was obligated to check on the welfare of the children. Saylor then spoke with L.T., who seemed scared. Through questions posed by Saylor, L.T. disclosed that her stepfather had hurt her "emotionally." Saylor referred the matter to Yolo County Child Protective Services (CPS).

Laura Nielsen of Yolo County Health and Human Services responded to investigate a report of child sexual abuse. Nielsen first spoke with L.T.'s mother and then with L.T. L.T. relayed to Nielsen her description of inappropriate touching by her stepfather. L.T. described the inappropriate touching as being on her breasts underneath her clothing, on her shoulders, and "on her frontal area." She did not indicate touching had occurred on her vaginal area. L.T. told Nielsen that the inappropriate touching occurred more than five times, but fewer than 10 times. Nielsen determined it would be unsafe for the children to remain in the home, and she requested the children be placed in protective custody.

The same day L.T.'s mother called the police, she texted defendant, accusing him of having sex with L.T. In response, defendant did not deny it. Instead, he texted, "If you really would like to talk, we can," and "[w]hen can I grab my stuff?"

7

When "this all blew up," L.T. and her siblings had to go live with their aunt. L.T. was sad about that. L.T.'s aunt testified that, when L.T. was 12 and turning 13, she "was a happy kid. She liked to play . . ., but she was completely different than she is now." After L.T. came to live with her aunt, L.T. was "very distraught, sad." She also became short-tempered.

Detective Eric Palmer of the West Sacramento Police Department located a cell phone associated with defendant. Palmer located a sexually explicit text message on the phone. The text message, sent to a woman named Shya on November 29, 2016, stated: "Over here thinking about your tight ass pussy right now." In another text message, sent on the same day police came and defendant vacated the house, defendant texted a male, stating, basically, "that he's single now, and if he knows of any girls that he could hook up with." Palmer testified defendant's date of birth was December 9, 1983.

Upon being assigned to the case, Detective Palmer sent a referral to the Multi-Disciplinary Interview Center (MDIC) for an interview. An MDIC is conducted by a child forensic specialist, someone who specializes in interviewing children in child sexual assault cases. The interview is observed by a detective, a deputy district attorney, another child forensic specialist, and sometimes a CPS worker.

L.T.'s aunt took L.T. for two different MDIC's. L.T.'s first MDIC occurred on February 28, 2017. A recording of the interview was played for the jury. In the interview, L.T. stated that she had told her mother that her stepfather had sent her inappropriate messages and given her an inappropriate massage. With regard to the massage, L.T. said he had been giving her a massage, but he said it probably did not feel very good through her clothing. He started to massage L.T. under her clothing. Initially, he massaged her back, but he moved on to "other body parts" including her chest. L.T. stated that, in a text message, defendant urged her to stay home from school the following day. He also said in a text message that he wanted to have sex downstairs. Asked who was sending those text messages, L.T. responded that it was "Ted," but that she called

8

him dad. When L.T. described the day she stayed home from school, she stated that her mother and siblings had left, and, later, her stepfather went to work. L.T. also told the interviewer that, after everything happened, when he came back to get his stuff, he apologized and said, " 'This is all my fault.' "

L.T.'s second MDIC occurred on March 22, 2017. A recording of this interview was also played for the jury. L.T. told the interviewer, "last time I came, I didn't—I told you the truth, but I didn't tell you everything that happened, so I thought that I should come back and say everything." L.T. said he made her do things other than the massage. There were times he made her have oral sex with him. He also made her have "regular sex" with him. L.T. said she did not want to and that it hurt, and he told her that was "just because that was the first time." L.T. continued: "there were other times where he—I don't want to say necessarily—like he wouldn't like, um—I'm trying to find the right words to say this, because it's not like he—um, there were other times where he would make me have sex, too, but it wasn't like he was making me, because I—making you is like where I don't—because it wouldn't seem—because after that—after the first time I was just scared, and I was just k—I felt like—like I couldn't even think right anymore, and I was just scared, so I didn't know what to say or what to do or anything. And nobody knew, and I didn't tell anybody after that time. So it was just me all alone, so the other times I just didn't say anything, but he still—he still had sex with me . . . ." L.T. said the first instance, involving both oral sex and vaginal sex, occurred in his Mercedes when he parked near some apartments during a trip to the grocery store. The oral sex happened first, when he "pushed [her] towards him." L.T. said sex occurred on two or three other occasions. The last time occurred in the living room. The other time occurred in L.T.'s mother's room. L.T. also said she told him to use protection, but that he said no because he did not have an STD.

Palmer testified no DNA was collected in this case based on the length of time between the last assault and when the abuse was reported.

9

Dr. Blake Carmichael worked as a psychologist and evaluation program manager in the Child Adolescent Abuse Resource Education Diagnostic and Treatment Center at the U.C. Davis Hospital. Carmichael testified as an expert in child sexual abuse, Child Sexual Abuse Accommodation Syndrome (CSAAS), and "the overall psychology of a child victim." Carmichael did not review anything about this case and he did not talk to any witnesses.

Carmichael discussed CSAAS, which was originally written about in the early 1980's. Dr. Roland Summit and his colleagues "started seeing a pattern of behavior of kids who they knew had been sexually abused and the way they told about what happened to them or why they might not tell about what happened to them. So they coined the" term CSAAS. CSAAS was used "to dispel myths . . . people held about kids who had been sexually abused to take away some of the misconceptions of what these kids are like." CSAAS is used to educate people to help them understand kids who have been sexually abused.

Carmichael testified there is no diagnostic tool to be used to determine *if* a child has been abused. Rather, CSAAS is used to help people better understand why children do not disclose sexual abuse right away, why there are delays in disclosure, the difficulties children have in suffering abuse at the hands of someone they know, and why that makes it difficult for the children to disclose the abuse.

Carmichael testified that "the vast majority of kids are abused by someone they know, someone they trust, someone who they've had an ongoing or existing relationship. It is rare that kids are sexually abused by someone they don't know or a stranger."

CSAAS employs five component concepts: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and unconvincing disclosure, and (5) recanting.

Secrecy refers to the idea that the perpetrator, through a variety of means, relies on the fact that the sexual abuse is happening in secret so no one else knows about it.

10

Carmichael agreed a child may not disclose abuse out of fear of breaking up the family and causing family members distress. Carmichael testified about the secrecy concept: "it is important to understand that secrecy is borne out of that relationship. A lot of times people might tell more quickly about a stranger, but if it is someone you know, someone you trust, someone you have an ongoing relationship with, close relationship, that secrecy or those delays can get even greater."

With regard to helplessness, Carmichael addressed the imbalance between a bigger, stronger, and more powerful perpetrator and a smaller, weaker, more vulnerable child victim. The imbalance becomes more pronounced if the perpetrator has responsibilities for caretaking, finances, or housing.

Carmichael testified that entrapment means something is occurring in secret and the victim is trapped in the relationship. Accommodation refers to how one copes with what is happening. Carmichael testified that dovetailing with entrapment and accommodation is disassociation—cognitively retreating, withdrawing, or tuning things out. Many children who experience sexual abuse will "stare off into space, numb out, tune out to try to not deal with the thoughts and the feelings that go along with being sexually abused." "That's a lot of reasons why kids can't tell you exactly what happened, because they were not focusing on the touch."

As for delayed and unconvincing disclosure, research indicated that children typically do not disclose sexual abuse right away. In fact, it might be weeks, months, or even years before a child discloses sexual abuse. And when children do disclose, disclosure is often incremental. They also might tell different people different details. As for "unconvincing" disclosure, Carmichael testified that "[p]eople want certainty, people want specific details to be convinced, but we know that kids who have been abused don't disclose that way. So because of that, we call that unconvincing even though we know the events have occurred."

11

Finally, retraction occurs where children known to be abused disclose and then later recant. According to Carmichael, 17 to 20 percent of children known to have been sexually abused disclose and then recant.

On the subject of grooming, Carmichael testified that, among other things, perpetrators "integrate touch or integrate rewards or integrate fun times together so that the child then normalizes touch in their relationship. They enjoy the time they spend with that person, video games, extra time on the phone, special attention. So as the touch progressively becomes more sexual, the child doesn't recognize that the touch is becoming more inappropriate because it is really just part of this relationship." The prosecutor posed a hypothetical involving a parent giving a child back rubs that started as shoulder massages but progressively involved touching farther and farther up the leg. Carmichael opined that was a good example of grooming.

### Stipulation

"The parties have agreed that Mr. Tyler plead no contest to a violation of . . . Section 220(a), assault with [intent] to commit rape in Santa Barbara County on December 3, 2001."

### Defense Evidence

E.B. was defendant's former girlfriend and mother of his son. E.B. acknowledged having an extramarital affair with defendant around the time defendant married L.T.'s mother. E.B. believed L.T.'s mother was still jealous of E.B. over the affair, and L.T.'s mother may have believed the affair was ongoing. E.B. never witnessed any concerning behavior between defendant and E.B.'s 10-year-old daughter. Nor did E.B. ever experience any "transgressions" by defendant. She characterized defendant as a very loving, caring father.

Defendant's brother lived in North Hollywood. He testified that, the week before Thanksgiving 2017, he went to defendant's house to pick up defendant's Mercedes

because defendant's brother did not have a car at that time. Defendant's brother left on November 19, before Thanksgiving. Defendant's brother testified that the driver's seat of the Mercedes did not adjust properly.

Defendant's mother testified defendant's birthday was December 9, 1980. However, she subsequently testified defendant was born in 1981. Defendant's mother testified defendant's brother took defendant's Mercedes to Southern California, leaving on November 18. She and defendant's brother subsequently traded cars, so defendant's mother drove defendant's Mercedes. She, too, testified the driver's seat was broken in that it was "stuck" and she "couldn't reverse it." Defendant's mother also testified L.T. and L.T.'s mother did not get along well and that they had a confrontational relationship. With regard to defendant's relationship with L.T., defendant's mother testified defendant was a very good father and a very loving man. She never saw defendant act inappropriately toward L.T. Defendant's mother also testified there was a time when L.T. was posting photographs of herself on Instagram in "Daisy Dukes," saying she was 21 years old.

Defendant's stepfather testified that, at one point, he drove defendant's Mercedes back up to Northern California. He could not get the driver's seat to adjust. He "couldn't hardly move it." Defendant's stepfather testified defendant had a great relationship with L.T. He testified L.T. would argue with her mother. Defendant's stepfather testified he saw L.T.'s Facebook posts where she claimed to be 21 and was wearing "Daisy Dukes."

Verdict and Sentence

The jury found defendant guilty on all counts. Defendant waived jury trial on the priors and the trial court found the four enhancement allegations to be true.

On June 28, 2018, the trial court granted defendant's *Romero* motion (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497) to the extent of striking one prior strike, for a violation of section 220. The trial court did not strike defendant's other strike, a

13

burglary conviction in violation of section 459.  The court sentenced defendant to an aggregate determinate term of 72 years, calculated as follows:  the upper term of eight years on count 1, oral copulation with a person under 14, doubled to 16 years based on his prior strike, plus s for the nickel prior enhancement and one year for the prior prison term enhancement; for each of counts 2 through 5, lewd or lascivious act upon a child under 14, one third the midterm of six years, or two years, doubled to four years, plus s for the nickel prior enhancement and one year for the prior prison term enhancement;[1] and one third the midterm of six years, or two years, on count 6, contacting or communicating with a minor with the intent to commit a sexual offense, doubled to four years, plus five years for the prior enhancement and one year for the prior prison term enhancement.

As we will discuss in part VI of the Discussion, *post*, the term imposed on count 6 was erroneous.

CDCR sent a letter to the trial court, filed August 2, 2018, raising a possible error in sentencing.

The trial court resentenced defendant on December 14, 2018.  The court imposed an aggregate determinate term of 40 years, calculated as follows:  the upper term of eight years on count 1, oral copulation with a person under 14, doubled to 16 years based on his prior strike, one third the midterm of six years, or two years, doubled to four years on counts 2 through 5, lewd or lascivious act upon a child under 14, one third the six-year midterm on count 6, contacting or communicating with a minor with the intent to commit a sexual offense, or two years, halved pursuant to sections 288.3 and 664, but then

---

[1]    As we will discuss in part V of the Discussion, *post*, it was error to impose the "five year prior" enhancement sentences on each count rather than once, and to impose one-year section 667.5, former subdivision (b) prior prison term enhancements on each count rather than once for a single prior prison term.

14

doubled based on defendant's prior strike, plus s for the nickel prior enhancement and one year for one prior prison term enhancement.

DISCUSSION

I

*There is Substantial Evidence Defendant Committed the Charged Offenses*

Defendant asserts insufficient evidence supports the jury's verdicts. Specifically, defendant asserts substantial evidence does not support the identification of him as the perpetrator of the offenses charged. Defendant emphasizes that L.T. identified "Ted" and "Ted Tyler" as the perpetrator, but did not identify defendant in court "and thus never verified that it was, in fact, [defendant] who committed the charged offenses against her." Additionally, defendant asserts "it is telling" that Detective Palmer, "who testified he spoke with 'the defendant' was never asked to confirm that, in fact, 'the defendant' was the same person that was on trial even though [defendant] was sitting in court with him." Defendant also emphasizes that Palmer's testimony as to defendant's birth date was different than that provided by defendant's mother.

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances

15

might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

We need not analyze this issue at great length.

Defendant—Ted Willie Tyler—was married to L.T.'s mother but he was not L.T.'s biological father. Defendant thus was L.T.'s stepfather. L.T. and her siblings came to live with L.T.'s mother and defendant in April 2016.

L.T.'s mother identified defendant in court as Ted Tyler, whom she had married in 2015.

In her direct and cross-examination exchanges with counsel at trial, and in her MDIC's, discussing the relevant matters and incidents in this case, L.T. answered questions about and discussed "Mr. Tyler," "Ted Tyler," "Ted," "defendant," her mother's husband, and her stepdad. While L.T. was not asked to identify defendant at trial, it is abundantly clear on this record that L.T.'s testimony was that it was defendant who committed the alleged acts against her.

L.T. also spoke of not telling anyone about the abuse because she did not want to break up the family. Defendant was married to L.T.'s mother.

L.T. described one incident occurring in the Mercedes. Defendant drove a Mercedes.

L.T. testified "Mr. Tyler's mother" was named Marilyn. Defendant's mother, who testified, was Marilyn.

L.T. testified she knew "Mr. Tyler's stepfather, Adrian." Defendant's stepfather, who testified, was named Adrian.

L.T. testified she knew "Mr. Tyler's brother, Nico." Defendant's brother, who testified, is named Domenico.

16

With regard to defendant's relationship with L.T., defendant's mother testified defendant was a very good father and a very loving man.

In essence, defendant seizes on the fact that L.T., his child victim, was not asked to, and thus did not, identify him at trial as the perpetrator of the sexual offenses committed against her (and that Detective Palmer also did not identify him at trial). However, while an in-court identification is the best practice, defendant cites no authority to support the proposition that such an identification was required as a matter of law.

As for Palmer and defendant's mother differing on defendant's date of birth, this presented an inconsequential evidentiary conflict. "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Viewing the evidence in the light most favorable to the prosecution (see *Jennings, supra*, 50 Cal.4th at p. 638), we conclude substantial evidence supports the jury's determinations that defendant was the perpetrator of the charged offenses. We cannot possibly say, " ' " 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

## II

### *Admission of Prior Sexual Offense Evidence*

Additional Procedural Background

In his in limine motions, defendant sought to exclude evidence of prior sexual offenses as well as prior misdemeanor and felony convictions. Defendant asserted his prior convictions were remote in time and any probative value was substantially outweighed by the probability that admission would create a substantial danger of undue prejudice. Defendant further asserted his prior conviction of assault with intent to

17

commit rape was "distinct and dissimilar to the current charges in that it shows no propensity on the part of Defendant to molest a child, or perpetuate acts of sexual assault against family members and serves no purpose other than to mislead, confuse and inflame the jury."

Days later, the prosecutor filed notice of evidence of other sexual offenses. (Evid. Code, § 1108.) The prosecutor indicated his intent to introduce evidence of a prior sexual offense, violation of Penal Code section 220, assault with intent to commit rape, in Santa Barbara County. Defendant opposed the notice, asserting the evidence was unfairly prejudicial as set forth in his in limine motions, and the evidence should be excluded under Evidence Code section 352.

In argument before the trial court, the prosecutor urged that prior sexual acts evidence "doesn't have to be an [Evidence Code section] 1101 type offense where it is motive, intent, opportunity, identification." Rather, if the prior act was a prior sexual offense, it should be admissible under Evidence Code section 1108.

Defense counsel in response again asserted the prior sexual act was remote in time. Defense counsel also emphasized the prior act involved an adult woman, not a child. Thus, the charged offenses were "sufficiently dissimilar and distinct from any kind of sexual assault that would involve an adult woman." Defense counsel asserted that, under Evidence Code section 352, admission of the prior conviction of assault with intent to commit rape would be unfairly prejudicial and it would confuse the jury.

The prosecutor responded that Evidence Code section 1108 is not limited to prior acts that are highly similar to the charged offenses. The prosecutor emphasized that cases such as this may turn on the victim's allegations and the defendant's denials, and the fact that the defendant has committed prior sex offenses is relevant.

The court opined that the charged offenses were more serious than the prior sexual offense given the fact that the charged offenses involved defendant's minor stepdaughter. The court agreed with defense counsel that "jurors will not like to hear that an individual

18

has an earlier sexual offense, and they may use it as propensity evidence," but the court further noted "that's what the legislature intended for . . . sex cases, and that doesn't mean the Court ignores [Evidence Code section] 352." The court concluded, "I don't see that the prejudice . . . substantially outweighs the probative value, but I would like to have a[n] [Evidence Code section] 402 [hearing], or at least have a more detailed offer of proof of what exactly she's going to testify to . . . ." The court stated that the evidence did not lose its probative value based solely on the fact that the incident occurred 17 years earlier.

L.D., the victim in the Santa Barbara County incident, testified at an Evidence Code section 402 hearing. Upon conducting its Evidence Code section 352 analysis, the court concluded it would allow the evidence to be placed before the jury.

<u>L.D.'s</u> <u>Trial</u> <u>Testimony</u> <u>and</u> <u>Defendant's</u> <u>Contentions</u>

In her trial testimony, L.D. testified that, in 2001, she was a student at the University of California, Santa Barbara. She lived on the second floor of a two-story apartment building that shared a deck with an apartment building next door. On September 23, 2001, L.D. was 19. L.D. and her roommates watched a movie while the neighbors across the deck were having a party. L.D. went to bed at approximately 2:30 or 3:00, wearing pajama pants and a tank top. At some point, L.D. woke up when she felt someone's hands touching her vagina inside her clothing, trying to penetrate her vagina. The person then stopped touching her, went "probably" to the foot of her bed, and started urinating on the floor. The person then tried to crawl in bed with L.D. L.D. turned the lights on, turned around, and saw defendant. L.D. said, "Who the fuck are you? What is going on?" Defendant responded, "It is okay. It is okay." L.D. told defendant, "Get the fuck away from me," and she got out of bed and ran towards the door. Defendant grabbed her arms trying to hold her back. L.D. pulled free, ran to her roommate's room, pounded on the door, her roommate came out, and they called Isla Vista Foot Patrol.

19

Meanwhile, defendant ran past L.D., out the door, across the deck, and into the party next door.  Defendant was eventually apprehended and L.D. identified him.  Defendant was convicted, upon his no contest plea, of assault with intent to commit rape.

Defendant asserts the trial court abused its discretion in admitting this evidence. According to defendant, the prior sex offense was remote in time, and the evidence concerning that offense was "stronger" and more inflammatory than the charged offenses. Defendant asserts the error in admitting this evidence was both one of state law and violated his due process rights under the Fourteenth Amendment to the United States Constitution.

To the extent defendant alludes to the possibility that admission of prior sex offenses under Evidence Code section 1108 is unconstitutional, our high court has rejected such contentions.  As our high court has stated recently:  "We held in *People v. Falsetta* (1999) 21 Cal.4th 903 . . . (*Falsetta*) that 'the trial court's discretion to exclude propensity evidence under section 352 save[d] [Evidence Code] section 1108 from' a 'due process challenge.'  [Citation.]  Defendant concedes as much, but asks us to 'revisit the issue,' observing that he must raise his objection now to preserve the issue for federal review.  We see no persuasive reason to revisit *Falsetta* and reject his claim on the merits."  (*People v. Baker* (2021) 10 Cal.5th 1044, 1089-1090 (*Baker*), fn. omitted.)

Admission of Prior Sexual Offense Evidence

" '[E]vidence of a person's character' is generally inadmissible 'when offered to prove his or her conduct on a specified occasion.' "  (*Baker, supra*, 10 Cal.5th at p. 1088, quoting Evid. Code, § 1101, subd. (a).)  "That general rule does not 'prohibit[] the admission of evidence that a person committed a crime . . . or other act' to prove something other than a person's 'disposition to commit such an act.' "  (*Baker*, at p. 1088, quoting Evid. Code, § 1101, subd. (b).)  "For example, other-acts evidence may be admissible to prove motive, intent, or that 'a defendant in a prosecution for an unlawful

20

sexual act . . . did not reasonably and in good faith believe that the victim consented.' " (*Baker*, at pp. 1088-1089, quoting Evid. Code, § 1101, subd. (b).) "The general rule against admission of 'so-called "propensity" or "disposition" evidence' is also subject to exceptions." (*Baker*, at p. 1089, quoting *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "Evidence Code section 1108 provides an exception to the general rule and permits evidence that a defendant accused of a sexual offense has committed another sexual offense, potentially showing a propensity to do so." (*Baker*, at p. 1089, citing Evid. Code, § 1108, subd. (a).) Evidence Code section 1108 applies "only if the evidence 'is not inadmissible pursuant to [Evidence Code] Section 352.' " (*Baker*, at p. 1089; Evid. Code, § 1108, subd. (a).)

" 'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.' " (*People v. Loy* (2011) 52 Cal.4th 46, 63 (*Loy*), quoting *People v. Yovanov* (1999) 69 Cal.App.4th 392, 405.) "Or, as another court put it, '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' " (*Loy*, at p. 63, quoting *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41.)

Assault with intent to commit rape in violation of Penal Code section 220 qualifies as a sexual offense under Evidence Code section 1108. (Evid. Code, § 1108, subd. (d)(1)(B).) Thus, in this criminal action in which defendant was accused of sexual offenses, evidence of defendant's commission of a prior sexual offense, assault with intent to commit rape (Pen. Code, § 220, subd. (a)), was not made inadmissible by Evidence Code section 1101 "if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1108, subd. (a).)

21

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168.)

As the parties note, in considering whether to admit evidence of prior sex offenses under Evidence Code section 1108 based on a weighing of the Evidence Code section 352 factors, "trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.)

<u>Analysis</u>

Defendant's contentions, essentially, are that the 2001 sexual offense was remote in time and the evidence relating to it was inflammatory and prejudicial.

The September 2001 sexual offense occurred approximately 15 years prior to the charged acts and 16 years prior to L.D.'s trial testimony in January 2018. "No specific time limit exists as to when an uncharged crime is so remote as to be excludable."

(*People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 (*McCurdy*).) In *McCurdy*, the defendant started to molest his sister around 30 years before committing the charged offenses, and the molestations of his sister ended around 17 years before the charged offenses. (*Ibid.*) Our high court upheld the admission of evidence concerning the defendant's molestation of his sister. (*Id.* at pp. 1094-1100.)

The admission of such evidence has been upheld in other cases despite similar and greater remoteness in time. In *People v. Robertson* (2012) 208 Cal.App.4th 965, 992-994 (*Robertson*), the court upheld the trial court's admission of evidence of a sexual offense committed 34 years before the charged crime. Similarly, in *People v. Branch* (2001) 91 Cal.App.4th 274 (*Branch*), the court upheld the admission of evidence of a prior sexual offense where there was a 30-year gap between the prior uncharged offenses and the charged offense. In *People v. Waples* (2000) 79 Cal.App.4th 1389 (*Waples*), the court upheld the admission of prior sexual offense evidence concerning acts occurring between 18 and 25 years prior to the charged offenses. The foregoing cases all upheld the admission of prior sexual offense evidence that was more remote in time than that in the instant case.

Courts have stated, however, that "[r]emoteness of prior offenses relates to 'the question of predisposition to commit the charged sexual offenses.' " (*Branch, supra*, 91 Cal.App.5th at p. 285, quoting *People v. Harris* (1998) 60 Cal.App.4th 727, 739 (*Harris*).) "In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However, . . . significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' " (*Branch*, at p. 285, quoting *Waples, supra*, 79 Cal.App.4th at p. 1395.) "Put differently, if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*Branch*, at p. 285.)

In his reply brief, defendant relies on *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*). In *Jandres*, the defendant was found guilty of forcible rape with a kidnapping enhancement, kidnapping to commit rape, and felony false imprisonment for offenses committed against an 18-year-old victim. (*Id*. at pp. 343, 344-345, 347.) At issue at trial was whether the defendant forcibly raped the victim, as she testified, or had consensual sex with her, as he maintained. (*Id*. at p. 356.) As for the prior uncharged sexual offense at issue, that victim testified the defendant "came into her grandmother's house, picked her up, and carried her about eight feet before dropping her and running out. She testified that, before picking her up, defendant 'shoved' his index finger in her mouth and scratched the inside of her cheek for 15 or 20 seconds." (*Id*. at p. 349.) It is important to note that, with regard to the prior uncharged act in *Jandres*, the reviewing court concluded that the question of whether that act was "motivated by an unnatural or abnormal sexual interest" (§ 647.6, subd. (a)(2)) so as to qualify as a prior sexual offense under Evidence Code section 1108 was "a close one." (*Jandres*, at p. 354.) The reviewing court determined that, "assuming the court made the preliminary determination that the jury could have concluded that [this] testimony proved a violation of . . . section 647.6 by a preponderance of the evidence, it did not abuse its discretion." (*Jandres*, at p. 355.) The *Jandres* court ultimately determined the trial court improperly admitted the prior act evidence. (*Id*. at p. 357.) The pertinent inquiry, according to the court, was "whether evidence that defendant exhibited sexual interest in an 11-year-old girl by putting his finger in her mouth rationally supports an inference that defendant is predisposed to rape an 18-year-old woman." (*Id*. at p. 356.) The court concluded: "[g]iven the many differences between the two offenses—including the circumstances (daytime attempted burglary in one case, possible stalking and attack at night in the other); the ages of the victims (11 and 18); and the nature of the conduct (inappropriate touching of the mouth in one case, rape in the other)—we think not." (*Ibid*.)

24

Defendant also cites *Harris, supra*, 60 Cal.App.4th 727, in his reply brief. In *Harris*, the defendant, a mental health nurse, worked at a mental health treatment center. A jury found him guilty of several sex offenses involving women he met through his work and who were vulnerable due to their mental health conditions. (*Id*. at p. 730.) The prior uncharged act evidence consisted of a conviction of first degree burglary with the infliction of great bodily injury. (*Id*. at p. 735.) That offense involved a female victim found in her apartment unconscious or semi-conscious " 'naked from the waist down with a nightgown on her upper body. And there was blood on her vagina and mouth area along with swelling on the right side of her face.' " (*Id*. at p. 734.) The defendant was located nearby outside with blood on the lower part of his shirt, on his crotch and stomach, inside his clothes, and on his penis. (*Id*. at pp. 734-735.) In closing, the prosecutor argued the defendant viciously sexually assaulted the victim of the uncharged offense, and that he picked victims who could not fight back. (*Id*. at p. 735.)

The *Harris* court concluded the trial court improperly admitted the evidence of the prior uncharged act because the "evidence was remote, inflammatory and nearly irrelevant and likely to confuse the jury and distract it from the consideration of the charged offenses." (*Id*. at p. 741.) Addressing probative value, the court stated the "evidence that defendant committed a violent rape of a stranger, as the jury was led to believe, did not bolster [the victims'] credibility nor detract from the evidence impeaching their stories." (*Id*. at p. 740.) The court further stated there was no meaningful similarity between the charged and uncharged acts. "The prior conduct evidence is so totally dissimilar to the current allegations that the trial court's finding that it was very probative fails to answer the question: Probative *of what*?" (*Ibid*., original italics.) The court further stated: "[t]his altered version of a 23-year-old act of inexplicable sexual violence while heavy with 'undue prejudice' and dangerous in the hands of a jury was not particularly probative of the defendant's predisposition to commit these 'breach of trust' sex crimes." (*Id*. at pp. 740-741.)

25

Here, the prior sexual offense against L.D. and the charged offenses against L.T. are rather dissimilar. In the offenses involving L.D., defendant entered the room of a sleeping 19-year-old adult woman, touched and tried to penetrate her vagina with his hands, and tried to get in bed with her before she escaped. In the charged offenses, occurring approximately 15 years later, defendant had oral and vaginal sex with his 13-year-old minor stepdaughter in his car and in the home he shared with the victim's mother and her children. The pertinent inquiry, then, is whether evidence defendant entered 19-year-old stranger L.D.'s bedroom, touched her vagina, and attempted to get into bed with her in 2001 is probative of defendant's propensity to engage in oral and vaginal sex with his 13-year-old stepdaughter in 2016 and 2017.

This case occupies something of a middle ground between those cases where the uncharged and charged sexual offenses, even if remote in time, were very similar (see *Robertson, supra*, 208 Cal.App.4th at pp. 992-993; *Branch, supra*, 91 Cal.App.4th at p. 285), and those cases in which the uncharged and charged sexual offenses were both remote and dissimilar (*Jandres, supra*, 226 Cal.App.4th at pp. 355-357; *Harris, supra*, 60 Cal.App.4th at pp. 740-741). We would caution against the admission of *entirely* dissimilar prior sexual offenses as remote in time as at issue here. However, we are also not persuaded that the evidence concerning defendant's prior offense against L.D. is entirely dissimilar to the charged offenses here, such as was the case in *Jandres, supra*, 226 Cal.App.4th 340. In any event, rather than expounding on the matter further, we conclude that, even if the trial court abused its discretion in admitting the evidence of defendant's prior sexual offense under Evidence Code section 1108, the error was harmless.

In light of this approach, we are not required to address defendant's additional contention that the prior sexual offense evidence was "stronger" and more inflammatory than the charged offenses. Nonetheless, we will say: that defendant preyed on his 13-year-old stepdaughter, thus exploiting that relationship, and had vaginal and oral sex with

26

her on more than one occasion is not "weaker" or less inflammatory than the assault on L.D.

Prejudice

In general, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Marks* (2003) 31 Cal.4th 197, 227.) The *Jandres* case, on which defendant relies, applied *Watson* to assess prejudice based on the improper admission of the prior sex offense evidence. (*Jandres, supra*, 226 Cal.App.4th at pp. 357, 359-361.) In his only discussion of prejudice and the applicable standard, defendant does not disagree with the Attorney General's contention that it is the *Watson* standard we should apply here, and he applies *Watson*. We agree *Watson* is the appropriate standard.

Under *Watson*, " 'defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955 (*Beltran*).) "Further, the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Id.* at p. 956.)

L.T. testified concerning several instances of sexual abuse at the hands of defendant. She testified that, on one occasion, defendant pulled his car over near an apartment complex, asked L.T. to put her mouth on his penis, and then grabbed her and

27

forced her to do so. When she resisted, he pulled her onto him and had vaginal sex with her. When L.T. told defendant it hurt, he told her that was because it was her first time.

According to L.T.'s trial testimony, another instance occurred in her living room. Defendant took his clothes off, took L.T.'s clothes off, and said he wanted to have oral sex. When L.T. refused, defendant put his penis in L.T.'s vagina.

Prior to the third occasion on which defendant made L.T. have sex with him, he texted her, telling her to tell her mother she was sick so she could stay home from school the next day. The following day, after L.T.'s mother had gone to work, defendant had L.T. come to his bedroom and he closed and locked the door. Defendant took his clothes off and he took her clothes off. He then put his penis in her vagina. L.T. asked if he was going to use a condom, and he told her "he didn't need one because he didn't have anything like STDs or anything like that." During this encounter, L.T. testified she remembered "trying not to—I remember trying not to think about it so that I could like feel better about it, I guess, and not feel as, like, scared and stuff, so I tried not to think about it." This would appear to be a classic example of disassociation as described by Dr. Carmichael: cognitively retreating, withdrawing, or tuning things out. Many children who experience sexual abuse will "stare off into space, numb out, tune out to try to not deal with the thoughts and the feelings that go along with being sexually abused."

These instances of oral and vaginal intercourse followed a progression in which defendant increased his sexual conduct towards L.T., beginning with simple massages, proceeding to massaging her inappropriately, then touching her upper legs and breasts. This calls to mind Carmichael's testimony, in this instance as to grooming: perpetrators "integrate touch or integrate rewards or integrate fun times together so that the child then normalizes touch in their relationship. They enjoy the time they spend with that person, video games, extra time on the phone, or special attention. So as the touch progressively becomes more sexual, the child doesn't recognize that the touch is becoming inappropriate because it is really just part of this relationship." Indeed, presented with a

28

hypothetical involving a parent giving a child back rubs that started as shoulder massages but progressively involved touching farther and farther up the leg, Carmichael responded that was a good example of grooming.

Much of L.T.'s trial testimony was corroborated by her prior consistent statements in her two MDIC's. Following her first interview, she returned for another because, she told the interviewer, "last time I came, I didn't—I told you the truth, but I didn't tell you everything that happened, so I thought that I should come back and say everything." The second interview, set forth in detail *ante*, was more descriptive and included a number of very specific details also contained in her trial testimony.

When L.T.'s mother became suspicious of defendant because of the difficulties in their marriage with intimacy and defendant's late night texting, she searched the phone bill and discovered defendant was texting L.T. That was what caused her to call the police.

After he left the house, L.T.'s mother texted defendant, accusing him of having sex with L.T. In response, defendant did not deny it. Instead, he texted, "If you really would like to talk, we can," and "[w]hen can I grab my stuff?" These responses are not inconsistent with an implied or adoptive admission. (See generally *Jennings, supra*, 50 Cal.4th at p. 661 [discussing adoptive admissions generally]; see also Evid. Code, § 1221 [adoptive admission].)

Furthermore, when defendant returned to the house to retrieve his things later in the day after police were called, defendant told L.T. that "it wasn't [her] fault and that he was sorry."

L.T.'s piecemeal disclosure of the details of the abuse was consistent with Dr. Carmichael's testimony about CSAAS.

In the face of this overwhelming evidence of defendant's guilt, the defense presented evidence from defendant's mother, stepfather, and brother intended to cast doubt on whether his Mercedes's driver's seat could recline, implying that L.T. could not

29

fit on the seat with him. However, L.T. affirmatively testified she did not recall whether it was even necessary for defendant to push his seat back so that she would fit there with him. Moreover, there was no evidence introduced as to when the Mercedes seat became defective. While defendant asserts elsewhere in his brief that the evidence established the Mercedes was not even in Northern California at the time L.T. described, her testimony concerning the timing of the incident in the Mercedes was not so specific as to establish whether it was before or after defendant's brother took the Mercedes. Defendant's mother and stepfather both testified defendant was a good father and loving man towards L.T. and had a great relationship with her, and that L.T. had posted photographs of herself on social media in short shorts and had indicated on the posts that she was 21.

It is not reasonably probable that, had the trial court barred L.D.'s testimony concerning defendant's 2001 sexual offense against her, he would have achieved a more favorable result. (See *Watson, supra*, 46 Cal.2d at p. 836.) On this record, the evidence supporting the judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, there is no reasonable probability the admission of this evidence affected the result. (*Beltran, supra*, 56 Cal.4th at p. 956.) Thus, even if it was error to admit this evidence, any such error did not prejudice defendant.

III

*Prosecutorial Misconduct and Denial of Defendant's New Trial Motion*

The Prosecutor's Closing Arguments

At the commencement of his closing argument, after reviewing the charges, the prosecutor stated: "What we've seen throughout this case is that the defendant has no sexual boundaries. He is proven time and again that he acts out sexually and acts out inappropriately sexually." After summarizing the 2001 incident involving L.D., the prosecutor stated: "This demonstrates the defendant has no sexual boundaries." After referring to his extramarital affair shortly after his marriage to L.T.'s mother, the

30

prosecutor stated: "He, again, demonstrates he has no sexual boundaries." The prosecutor reprised this line about sexual boundaries after discussing two of the incidents involving L.T., after describing the November 29, 2016, text message to Shya, and after describing the text message to a male, on the day the abuse was reported, asking if the male knew any women defendant could hook up with. At the end of his initial closing argument, the prosecutor stated: "The defendant demonstrated throughout this entire case that he has no sexual boundaries. There is no reasonable doubt in this case. I ask you to come to the only just verdict that there is. Find the defendant guilty."

In his rebuttal closing argument, the prosecutor addressed the defense's emphasis on the fact that the children were taken from L.T.'s mother due to her inability to protect them. The prosecutor stated: "Yeah, that's right. Failure to protect, protect her daughter from a sexual predator. They weren't being beaten. They weren't being malnourished, but she had brought in this sex offender into their home and did not protect these children." Later in his rebuttal argument, the prosecutor stated: "The Defense completely sweeps under the rug the defendant's sexual improprieties. Well, sure, he had an affair after he was married to one woman. He had an affair with [E.B.]. Sure, he had an affair with this woman [to whom he sent the text message]. Sure, he sexually assaulted [L.D.], but they're all adult women, so it's okay. Because that's his boundary? Because sure, he's sexually inappropriate but he would never go beyond that? There is simply no evidence to that."

### Prosecutorial Misconduct and Forfeiture

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct

31

even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359 (*Parson*); see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.) "To establish misconduct, defendant need not show that the prosecutor acted in bad faith." (*People v. Cortez* (2016) 63 Cal.4th 101, 130, citing *People v. Hill* (1998) 17 Cal.4th 800, 822.)

Defendant asserts the prosecutor committed error in closing argument. Specifically, defendant asserts: "what the prosecutor did was to argue that the jury should convict [defendant] because [defendant] had sex, and expressed interest in sex, outside of his marriage. This, we submit, was an attack on [defendant's] character and background and invited the jury to convict [defendant] because, inter alia, he was an immoral person that had sex with adult women he was not married to, and not because he committed an illegal act that the evidence showed was proven beyond a reasonable doubt. Put simply, the fact that [defendant] engaged in, and expressed interest in, having sex with women other than his spouse at the time was immaterial to the issue presented, i.e., whether the evidence adduced at trial proved the elements of the offenses beyond a reasonable doubt. Such character assassination should have no place in a criminal trial."

To preserve a claim of prosecutorial misconduct for appeal, " ' "a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety." ' " (*People v. Powell* (2018) 6 Cal.5th 136, 171, quoting *People v. Clark* (2011) 52 Cal.4th 856, 960.) "The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm." (*Powell*, at p. 171.)

Defendant acknowledges his trial counsel did not object or request a curative instruction. Nor does defendant argue that a timely objection would have been futile or that an admonition would not have cured the harm. However, defendant points out we have the discretion to consider unpreserved misconduct claims. In the event that we decline to do so, defendant asserts he was deprived of the constitutionally effective

32

assistance of trial counsel. Because defendant forfeited his contention, we turn to his ineffective assistance of counsel claim.

Ineffective Assistance of Counsel

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692 [80 L.Ed.2d 674, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*); *People v. Rogers* (2016) 245 Cal.App.4th 1353, 1367 (*Rogers*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371 [176 L.Ed.2d 284, 297].)

It is improper for the prosecutor to appeal to the passions and prejudices of the jury in closing argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342.) However, "the prosecutor has a wide-ranging right to discuss the case in closing argument. He [or she] has the right to fully state his [or her] views as to what the evidence shows and to urge whatever conclusions he [or she] deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.) " ' " ' "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] . . ." [Citation.] "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness" ' [citation], and he may 'use appropriate epithets . . . .' " ' [Citation.]" ' [Citations.] 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Gamache* (2010) 48 Cal.4th 347, 371.)

33

The prosecutor's remarks here were fair comment on the admissible evidence and did not go beyond the wide latitude afforded prosecutors during argument. They did not invite the jury to convict defendant on grounds other than the evidence addressed to the charged offenses. Indeed, we cannot say defendant's willingness to engage in sexual activity outside of his marriage was irrelevant to the charged offenses. The prosecutor's remarks did not infect the trial with such " ' " 'unfairness as to make the resulting conviction a denial of due process.' " ' " (*Parson, supra*, 44 Cal.4th at p. 359.) Nor did they otherwise constitute deceptive or reprehensible methods. Because these remarks did not constitute misconduct, defendant's trial attorney was not constitutionally ineffective for failing to object to the remarks in closing.

Moreover, to establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra*, 562 U.S. at p. 104 [178 L.Ed.2d at p. 642].) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694 [80 L.Ed.2d at p. 697]; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694 [80 L.Ed.2d at p. 698]; accord, *Ledesma*, at p. 218.) "*The likelihood of a different result must be substantial*, not just conceivable." (*Richter*, at p. 112 [178 L.Ed.2d at p. 647], italics added; *Rogers, supra*, 245 Cal.App.4th at p. 1367; *People v. Jacobs* (2013) 220 Cal.App.4th 67, 75; *In re M.P.* (2013) 217 Cal.App.4th 441, 457, fn. 10.)

In the context of the evidence as addressed in our discussion of prejudice in part II of the Discussion, *ante*, we cannot conclude that there is a reasonable probability defendant would have attained a more favorable result had his trial counsel objected to the prosecutor's remarks in closing.

New Trial Motion

Prior to sentencing, defense counsel moved for a new trial, asserting the prosecutor committed misconduct in his closing argument to the jury. Defendant emphasized the prosecutor in closing "elaborated on the prior conviction for sexual assault on an adult woman that occurred 17 years ago, saying this demonstrated that Defendant has no sexual boundaries. He then goes further in his rebuttal argument and describes Defendant as 'a sexual predator.' " According to defendant, the only purpose of this argument was to inflame the jury and the prosecutor did so by emphasizing highly prejudicial evidence against defendant.

The trial court denied defendant's new trial motion. The trial court stated: "There is actually quite a bit of case law in the Court of Appeal of what can be said in closing in terms of characterization of the defendant. And the Court of Appeal has given prosecutors significant latitude. And I'm aware of cases in which prosecutors have made much more colorful comments than [the prosecutor] made here and the Court of Appeal has not reversed. I do not find any prosecutorial misconduct."

Defendant asserts the trial court abused its discretion in denying his new trial motion. Defendant asserts that, in denying the new trial motion because "other 'more colorful' statements of prosecutors were not found to be misconduct on appeal," the trial court employed an incorrect legal standard. According to defendant, the prosecutor's language was a blatant appeal to passion and prejudice.

The statutory grounds pursuant to which a trial court is authorized to grant a new trial are set forth in section 1181. Among other grounds warranting granting a new trial motion is "when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury." (§ 1181, subd. (5).)

" ' " 'We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] ' "A trial court's ruling on a

35

motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' " ' " (*McCurdy, supra*, 59 Cal.4th at p. 1108; *People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*).)

We determined, *ante*, that the prosecutor's remarks in closing were not improper. Accordingly, we cannot conclude the trial court abused its discretion in denying defendant's new trial motion on the basis of those remarks. Moreover, defendant has not demonstrated the trial court employed an incorrect legal standard. Rather, in denying the motion, the court merely noted that it was "aware of cases in which prosecutors have made much more colorful comments than [the prosecutor] made here and the Court of Appeal has not reversed." Because the prosecutor's remarks were not improper and the court did not employ an incorrect legal standard, the trial court's denial of defendant's new trial motion was not a " ' " ' "manifest and unmistakable abuse of . . . discretion." ' " ' " (*McCurdy, supra*, 59 Cal.4th at p. 1108; *Delgado, supra*, 5 Cal.4th at p. 328.)

IV

*Cumulative Trial Error*

Defendant asserts the cumulative effect of the errors he alleges violated due process and prejudiced him, mandating reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.)

We have concluded defendant's claims of error are without merit, or, at most, raise a possible harmless error. Thus, there is no cumulative effect of error to consider. "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Defendant was not deprived of a fair trial.

36

V

*Imposition of Enhancement Sentences on Each Count*

Defendant asserts the trial court erred in imposing a five-year enhancement sentence on each count. Defendant relies on *People v. Sasser* (2015) 61 Cal.4th 1 (*Sasser*). In *Sasser*, our high court held that a "prior serious felony enhancement may be added only once to multiple determinate terms imposed as part of a second strike sentence." (*Id*. at p. 7.) Our high court revisited the distinction drawn in section 1170.1 "between offense-based enhancements, which apply to every relevant count, and status-based enhancements, which apply only once," and observed that the structure set forth in section 1170.1, subdivision (a), " 'makes it very clear that enhancements for prior convictions do not attach to particular counts but instead are added just once as the final step in computing the total sentence.' " (*Sasser*, at p. 15.)

Defendant acknowledges, however, that "the trial court corrected its initial sentence to remove the 5 year enhancements on each count," and that the trial court's amended sentence "was the legally correct sentence and, therefore, that sentence should stand." The Attorney General agrees that the amended sentence is correct.

Defendant advances this contention "in an abundance of caution to preserve the issue in the event that this Court should find that the trial court exceeded its jurisdiction in correcting the sentence given." The Attorney General asserts that, under the circumstances of this case, pursuant to section 1170, subdivision (d)(1), the trial court had the authority to resentence defendant based on the recommendation by CDCR.

Section 1170, subdivision (d)(1) provides, in part: "When a defendant subject to this section or subdivision (b) of Section 1168 has been sentenced to be imprisoned in the state prison or a county jail pursuant to subdivision (h) and has been committed to the custody of the secretary or the county correctional administrator, the court may, within 120 days of the date of commitment on its own motion, or at any time upon the

recommendation of the secretary or the Board of Parole Hearings in the case of state prison inmates, . . . recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence."

Here, defendant was originally sentenced on June 28, 2018. Thus, the 120 days applicable were the court to resentence defendant on its own motion would have expired before the court resentenced defendant on December 14, 2018. However, critically, CDCR sent a letter to the trial court, filed August 2, 2018, raising a possible error in sentencing. Defendant filed his notice of appeal on August 20, 2018, prior to the trial court's resentencing. However, "[s]ection 1170(d) provides an exception to the general rule that the filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur, and deprives the trial court of jurisdiction to make any order affecting the judgment." (*People v. Williams* (2007) 156 Cal.App.4th 898, 909.) Accordingly, having received the CDCR letter, under section 1170, subdivision (d)(1), the court was authorized to recall and resentence defendant "at any time upon the recommendation of the secretary." The court did so, and, as the parties agree, the amended sentence is correct.

VI

*Sentence Imposed on Count 6*

Defendant asserts the trial court erred in imposing sentence on count 6 by (1) imposing a longer sentence than authorized by statute, and (2) not staying the sentence imposed pursuant to section 654.

Authorized Sentence

Like his contentions in part V of the Discussion, *ante*, defendant asserts the sentence imposed on count 6 at resentencing was correct. He asserts the sentence originally imposed on count 6 was error, and raises this issue in the interest of

38

preservation in the event we were to determine the trial court lacked jurisdiction to resentence defendant as it did.

As we concluded in part V of the Discussion, *ante*, the trial court had authority to recall and resentence defendant. The sentence imposed upon resentencing defendant on count 6 was correct.

Section 654

Defendant asserts he had one objective in sending the text message to L.T. telling her to stay home from school (which text message supported count 6): to have sex with her. On count 4, he was convicted of having sex with L.T. on that occasion. Therefore, defendant asserts he may serve but one sentence for these two crimes consisting of the same objective.

The Attorney General responds that counts 4 and 6 "were sufficiently separated in time that [defendant] had an adequate opportunity to reflect on his actions and renewed his criminal intent." The Attorney General also asserts defendant "may have had multiple intents when he communicated with L.T. and urged here to stay home from school," such as committing a variety of sex offenses in addition to intercourse.

Subdivision (a) of section 654 provides, in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 336.) "If, on the other hand,

39

defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  An implicit determination that there was more than one objective is a factual determination that must be sustained on appeal if it is supported by substantial evidence.  (*People v. Osband* (1996) 13 Cal.4th 622, 730.)

"It seems clear that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 (*Beamon*).)  " 'This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' " (*People v. Andra* (2007) 156 Cal.App.4th 638, 640.)

We reject defendant's argument.  As stated *ante*, section 654 "applies to 'a course of conduct deemed to be *indivisible in time*.' " (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253, quoting *Beamon, supra*, 8 Cal.3d at p. 639, fn. 11, original italics.)  However, "where a course of conduct is divisible in time it may give rise to multiple punishment even if the acts are directive to one objective." (*People v. Louie* (2012) 203 Cal.App.4th 388, 399, citing *Beamon*, at p. 639, fn. 11.)  "If the separation in time afforded [the] defendants an opportunity to reflect and to renew their intent before committing the next crime, a new and separate crime is committed." (*Louie*, at p. 399.)

Here, defendant texted L.T. and instructed her to tell her mother she was sick so that she could stay home from school the next day.  The following day, after L.T.'s mother went to work, defendant had sex with L.T.  Defendant had ample opportunity to reflect and to renew his intent to commit the lewd act charged in count 4.  His decision to

40

proceed with that act is separately punishable given that the two acts were divisible in time.

In *People v. Medelez* (2016) 2 Cal.App.5th 659, the court concluded under section 654 the defendant could not be punished for both attempted oral copulation (§ 664, former § 288a, subd. (b)(1)) and contacting or communicating with a minor with the intent to commit a sexual offense (§ 288.3) "because the crimes were based on a single intent and objective . . . ." (*Medelez*, at p. 663.) However, first, in *Medelez*, the Attorney General conceded the issue. Second, the two events in *Medelez*—attempted oral copulation and "luring"—occurred on the same day. (*Id*. at p. 662.) Third, the *Medelez* court did not explicitly appear to consider whether the actions were divisible in time and, as such, potentially subject to separate punishment. (*Id*. at pp. 663-664.)

In *People v. Latimer* (1993) 5 Cal.4th 1203, on which defendant relies in his reply brief, the defendant pleaded no contest to two counts of forcible rape (§ 261, former subd. (a)(2)) and one count of kidnapping (§ 207, subd. (a)). (*Latimer*, at p. 1206.) "[O]n Christmas Eve 1989, defendant and the victim . . . went on some errands . . . . At one point, instead of stopping as he was supposed to, defendant drove past the end of the paved road and into an undeveloped area of nearby desert." (*Ibid*.) The defendant raped the victim, they drove another 50 to 75 yards into the desert, and the defendant raped the victim again. (*Ibid*.) Our high court stated: "Although the kidnapping and the rapes were separate acts, the evidence does not suggest any intent or objective behind the kidnapping other than to facilitate the rapes." (*Id*. at p. 1216.) Thus, " '[s]ince the kidnapping was for the purpose of committing the sexual offenses and [defendant] has been punished for each of the sexual offenses,' section 654 bars execution of sentence on the kidnapping count." (*Id*. at p. 1216.) *Latimer* is readily distinguishable on the ground that the kidnapping and rapes occurred contemporaneously.

The trial court properly imposed a consecutive sentence on count 6.

DISPOSITION

The judgment is affirmed.

---------------------------------------

HULL, Acting P. J.

We concur:

---------------------------------------

ROBIE, J.

---------------------------------------

DUARTE, J.